UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ABDULKADIR MOHAMED,**<br><br>Plaintiff,<br><br>v.<br><br>**GEORGE WASHINGTON UNIVERSITY,** *et al.*,<br><br>Defendants. | Case No. 1:22-cv-812 (TNM) |

## MEMORANDUM OPINION

A man asked his employer for leave to take care of his father in Italy. His employer conditionally granted that leave but told him that he needed to submit medical forms within 15 days. The man missed the deadline, so the employer denied his leave and asked him to return to work. But the man did not get back to work or respond to the employer's calls or emails. Instead, he finally flew to Italy—more than a month after his leave had started.

After the employer heard nothing from him for weeks, it fired him. Now, the man says that the employer interfered with his rights under the Family & Medical Leave Act and retaliated against him too. The employer did neither. Because there is no genuine dispute of material fact about that, the Court will grant the employer's motion for summary judgment on both claims.

**I.**

Abdulkadir Mohamed worked in George Washington University's main library for nearly three decades. Def.'s Stat. of Undisp. Mat. Facts ¶ 1 (SUMF), ECF No. 19-3. Back in 2019, Mohamed reached out to the University about taking leave under the FMLA to attend to his father in Italy. *Id.* ¶¶ 4–5. The University told Mohamed that he could apply for leave through a

contractor, Lincoln Financial. *Id.* ¶ 5. And it warned him that he would need to send Lincoln a "medical certification form" by a certain deadline to qualify for leave. *Id.* ¶ 6.

So Mohamed applied to Lincoln, asking for time off from September 24 to November 29. *Id.* ¶ 7. Lincoln acknowledged Mohamed's request, warning him that its response was "not an approval" and that he would need to provide a completed medical certification "within 15 days after [his] scheduled leave begin date." *Id.* Plus, it cautioned Mohamed that his "[f]ailure to provide [the medical certification] may result in a denial for your leave request" and that "time taken may count against you in accordance with your employer's attendance policy." *Id.*

Days before Mohamed's leave was scheduled to start, he got the *conditional* green light from the University. On September 20, the University emailed Mohamed to tell him that his FMLA "request [was] still pending, per [his] submission of" the medical certification to Lincoln. Dep. Ex. 5, ECF No. 19-6. Though he was "authorized" to begin his leave "while it [was] in a pending status," the University warned him again that "if the medical certification is not submitted, the time you are out will not be covered under FMLA." *Id.*

Mohamed seemed to understand, replying, "This is very helpful. Hence, I am going to commence my FMLA leave request while it is in a pending status and will send the required medical certification directly to Lincoln Financial . . . in a timely fashion." *Id.* Mohamed also asked Lincoln twice if it would extend his 15-day deadline to submit the required medical certification. He was told no both times. *See* Decl. of Abdulkadir Mohamed (Mohamed Decl.) ¶¶ 8, 10, ECF No. 23-2.

Though Mohamed began his leave in late September, he waited over a month to fly to Italy. *Id.* ¶ 12. He claims now that he used that time in America to "provid[e] emotional

support" to his father and "obtain an affordable airline ticket."[1]  *Id.* ¶ 9.

In the meantime, Mohamed never submitted his medical certification.  So on October 9, Lincoln denied his FMLA application.  *Id.* ¶ 11.  The University then emailed and called Mohamed repeatedly, notifying him that his leave had been denied and directing him to reach out to Human Resources.  It emailed him on October 11.  Dep. Ex. 11, ECF No. 19-6.  And it contacted him again on, at least, October 16, 17, 22, and 23.  Dep. Ex. 12–14 ("Your department head . . . attempted to contact you via email and by phone on October 16th, 17th, 22nd, and I spoke with your sister . . . on October 23rd.").  After weeks of radio silence from Mohamed, the University emailed him "a final warning," cautioning him that "it would interpret [his] silence as job abandonment" if he remained AWOL.  Mohamed Decl. ¶ 13.

But despite the University's many warnings, Mohamed never responded.  The University then checked to make sure that Mohamed had not been in touch with Lincoln either.  Lincoln confirmed that it had heard nothing from Mohamed in about a month.  SUMF ¶ 68.  So in early November, the University fired him.  *See* Mohamed Decl. ¶ 16.

Mohamed then sued the University and Lincoln under the FMLA and the Civil Rights Act.  *See* Compl. at 1, ECF No. 1-1.  He claims that they interfered with his rights under the FMLA, retaliated against him, and discriminated against him.  *See generally id.*  Last year, the Court dismissed much of Mohamed's case, but let his FMLA claim against the University go forward.  *See Mohamed v. Geo. Wash. Univ.*, No. 22-cv-00812, 2022 WL 3211806, at *1 (D.D.C. Aug. 9, 2022).  Both sides have moved for summary judgment.  *See* Mots. for Summ. J.,

---

[1] Despite allegedly struggling to afford an airline ticket to Italy, Mohamed admits that he also went to "Denmark to visit family" and "Dubai . . . for a few weeks" after his stay in Italy.  Mohamed Decl. ¶ 21.

3

ECF Nos. 19, 25. The University also moved for sanctions, which the Court imposed. *See* Mem. Order, ECF No. 32. With sanctions out of the way, the Court now addresses the merits.

## II.

To win summary judgment, a party must show that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A fact is material if it could change a case's outcome. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* At this stage, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in [that party's] favor." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006). But the nonmoving party cannot avoid summary judgment with unsupported allegations or mere denials in the pleadings. *See Harris v. Trs. of Univ. of D.C.*, 567 F. Supp. 3d 131, 143 (D.D.C. 2021).

## III.

Mohamed presses two claims under the FMLA—interference and retaliation. There is no genuine dispute of material fact as to either claim. So the Court will grant the University's motion for summary judgment.

### A.

Start with Mohamed's FMLA interference claim. To make that out, Mohamed "must show (1) employer conduct that reasonably tends to interfere with, restrain, or deny the exercise of FMLA rights, and (2) prejudice arising from the interference." *Waggel v. Geo. Wash. Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020). The first element is not genuinely disputed.

Put simply, the University did nothing that interfered with Mohamed's ability to take FMLA leave. Mohamed's theory seems to go like this: The University approved him for leave.

And it told him that he should communicate solely with Lincoln about that FMLA leave. So the University interfered with his FMLA leave when it fired him for abandoning his job, even though it "knew he had not abandoned his job and [that] he was attempting to obtain the FMLA medical certification." Mohamed Reply at 3–4, ECF No. 31.

This theory has many fatal flaws. For one, the University never told Mohamed that he was fully approved for leave. Rather, it told him that he was "authorized to begin" his leave "while it [was] in a *pending* status." Dep. Ex. 5 (emphasis added). And it warned him that "if the medical certification is not submitted, the time you are out will not be covered under FMLA." *Id.* Mohamed understood that his leave was not finally approved. *Id.* ("I am going to commence my FMLA leave request while it is in a *pending* status." (emphasis added)). And he knew that he needed to submit the medical certification form within 15 days. *See id.* (promising that he would "send the *required* medical certification directly to Lincoln Financial . . . in a *timely* fashion" (emphasis added)).

Second, the University was allowed to make Mohamed submit a medical certification. *See* 29 C.F.R. § 825.305(a). And it could set a 15-day deadline. *See id.* § 825.305(b). Plus, when he provided no medical certification within 15 days, the University was allowed to deny his leave. *See id.* § 825.305(d).

Mohamed tries to push back, arguing that the Court should consider his "extenuating circumstances." Mohammed Motion for Summ. J. (Mohamed MSJ) at 15, ECF No. 23. True, the 15-day deadline can be relaxed where "it is not practicable under the particular circumstances." 29 C.F.R. § 825.305(b). But that is so only when the employee had made "diligent, good faith efforts" to comply. *Id.* And here, Mohamed did no such thing. Indeed, he says that he "*began* to seek a FMLA medical certification" in "late October," once he arrived in

5

Italy. Mohamed Decl. ¶ 14 (emphasis added). And it was not until "that time" that he "learned . . . that he needed [his] father's consent before the physician" would complete the form. *Id.* More, he admits that "he did not provide the FMLA certification forms to any health care provider" until November 6. SUMF ¶ 76. So, according to Mohamed, he did not start trying to complete the required form until more than three weeks *after* it was due. That is not diligent.

Third, Mohamed suggests that he faced "complications, and unique circumstances" in trying to get his medical certification because he needed his father's consent, and the doctor was located overseas. Mohamed MSJ at 12. Because of that, he says, he was entitled to an a "reasonable interactive process." *Id.* Basically, Mohamed argues that the University should have worked with him, while he ignored weeks' worth of its emails and phone calls. But how could the University accommodate a non-responsive employee?

Fourth, Mohamed seems to suggest that the University interfered with his FMLA leave because it told him that he should communicate with only Lincoln about the leave. *See* Reply at 1. Indeed, he calls that "the most important fact in the case." *Id.* This argument fails for a few reasons. To start, the Court has precluded Mohamed from making it as a sanction for flouting his discovery obligations. *See* Mem. Order at 7–8.

More, telling Mohamed to communicate with the third-party administrator did not interfere with any of his FMLA rights: It did not stop him from starting his leave. Nor was it the reason his leave was eventually denied; that was because he never submitted his medical certification. Nor was it the reason that he was eventually fired; that was because he never went back to work or responded to the University after it denied his leave.

Although Mohamed never clearly spells it out, he seems to suggest that had he not been told to communicate only with Lincoln, then he would have responded to the University's many

emails warning him to return to work. For example, Mohamed says that he "communicated exactly in the manner and to whom he was told to communicate while on FMLA leave." Reply at 3. And he says that the University now seeks to "blame [him] for following the instructions" that it gave him. *Id.*

But Mohamed failed to communicate with Lincoln either. He apparently missed its email telling him that his leave had been denied. Mohamed Decl. ¶ 11. And he did not follow up with Lincoln for nearly a month after that. *Id.* ¶ 15. During most of that time, Mohamed was still in America. *Id.* ¶ 14.

Nor *could* he have communicated with the University because he apparently did not see its October emails. *See, e.g., id.* ¶ 13 (asserting that he "did not receive" the October 31 email). So any instruction from the University to communicate with only Lincoln cannot be what caused Mohamed to ignore the University's emails—overtures that he apparently never saw in the first place.

Finally, to make this argument even more cockamamie, Mohamed admits that "he knew that if he failed to provide the certification forms within 15 days he could be considered Absent Without Leave and in danger of losing his job." SUMF ¶ 48. Under those circumstances, no reasonable jury could accept his suggestion that he ignored his employer's warnings to return to work because it told him to apply for leave through a third party.

Fifth, Mohamed claims his firing counts as interference because "the medical leave and the termination are inextricably intertwined." Mohamed MSJ at 12–13. Because of that his "termination was not 'unrelated' to [his] leave." *Id.* at 13. But this argument proves too much. Imagine this: An employer tells an employee that he will need to submit medical documents if he wants to get his FMLA leave approved. Frustrated, the employee responds by calling his

7

employer vulgar names. The employer then fires him. If Mohamed is right, the employee would have a viable interference claim because his bad conduct was related to his request for FMLA leave. But that, of course, is not the law.

So too here. Mohamed cites no case law for the rule that an employee can request FMLA leave, have that leave denied because of his own failings, ignore his employer's requests to return to work, and then claim interference. That is because Mohamed had no right under the FMLA to provide no medical certification and then go AWOL for nearly a month. An employee's "rights to FMLA leave . . . do not protect an employee's job against a legitimate, unrelated, reason for separation from employment." *Williams v. Verizon Wash., D.C. Inc.*, 304 F. Supp. 3d 183, 194 (D.D.C. 2018). That includes an employee's misconduct surrounding his FMLA leave. *See id.* at 194–95 (finding no interference where company fired an employee who lied when the company was investigating him for FMLA fraud).

Neither does the Court endorse Mohamed's suggestion that he even qualified under the FMLA to provide remote emotional support for his father in Italy. He cites no support for that novel theory. And in the end, it matters little because even if that was a valid use of his FMLA leave, Mohamed still loses.

Sixth, Mohamed makes much of a clarification from Lincoln that a denied leave could "be overturned with complete medical certification forms." Dep. Ex. 9. But he never explains how that counts as interference either, and the Court does not see how it could.

Because Mohamed points to nothing that a reasonable jury could find qualifies as interference with his FMLA rights, the Court will grant the University's motion for summary judgment on Mohamed's interference claim.

**B.**

Next, consider Mohamed's FMLA retaliation claim. He loses here too. The University has given a legitimate, nonretaliatory reason for firing him. And Mohamed has not shown pretext.

FMLA retaliation claims are governed by "Title VII's . . . burden-shifting regime." *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161 (D.C. Cir. 2015). Under that framework, Mohamed must first make out a prima facie case by showing "(1) the exercise of protected FMLA activity; (2) an adverse employment decision; and (3) a causal connection between the protected activity and the adverse action." *Waggel*, 957 F.3d at 1375. If he succeeds, the burden shifts to the University to show "a legitimate, nonretaliatory reason for the adverse action." *Id.* And if the University does that, the burden shifts to back to Mohamed to provide "evidence of pretext." *Id.* at 1375–76.

*Legitimate reason.* The University's legitimate reason for firing Mohamed is simple. It conditionally approved Mohamed's FMLA. When it did that, it warned him that (1) he needed to provide a medical certification, and (2) his failure to do so could result in his leave being denied. Plus, the University warned Mohamed that he could be considered AWOL if he did not return to work once his leave was denied.

Despite these warnings, Mohamed did not submit his medical certification within the 15-day deadline. Then Mohamed did not return to work. And he did not respond to the University's repeated calls and emails, including a "final warning," in which the University threatened to fire him. Mohamed Decl. ¶ 13. So roughly three weeks after Mohamed was required to return to work, the University fired him for going AWOL. Protracted truancy, of

9

course, is a legitimate reason to fire an employee. *See, e.g.*, *Holloway v. District of Colum.*, 9 F. Supp. 3d 1, 10 (D.D.C. 2013).

*Pretext.* Mohamed's only real pretext argument is a dud. As he puts it, his medical "certification was provided on November 7, 2019 and the termination was not approved until November 8, 2019, and therefore *there was* an immediate termination as soon as proper documentation was supplied." Mohamed MSJ at 14–15 (emphasis in original). But there is a big problem with this theory. The University began the process of firing him the day *before* he submitted his medical certification. On November 6, two University officials emailed an Assistant Vice President seeking "approval to terminate [Mohamed's] employment. SUMF ¶ 69. So that certification did not trigger his firing.

Because Mohamed offers nothing to show that the University's legitimate reason is a pretext, the Court must grant the University summary judgment on his retaliation claim too.

## IV.

In some cases, there is no smoke or fire. Mohamed was approved for conditional leave, shirked his duties, got his leave denied, and then went AWOL for weeks on end while ignoring his employer. The University did not interfere with his FMLA rights when it fired him for that. Nor did it retaliate against him. Because there is no genuine dispute of material fact as to either of these claims, the Court will grant summary judgment to the University on both. For the same reason, the Court will deny Mohamed's motion for summary judgment.

A separate Order will issue today.

Dated: September 22, 2023                                         TREVOR N. McFADDEN, U.S.D.J.